```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  03/26/2024
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
JUAN HERNANDEZ,

       Plaintiff,

-against-

2400 AMSTERDAM AVE. REALTY CORP.,
2400 AMSTERDAM AVENUE REALTY CORP.,
RICK ELEZI MANAGEMENT, INC. d/b/a REM
Residential, ATANACIO CORTEZ A/K/A
ATANASIO OR CORTES, RICARDO CORTEZ
A/K/A CORTES and ALANA STRIDIRON,

       Defendants.

22 Civ. 3094 (AT)

**ORDER**

ANALISA TORRES, District Judge:

  Plaintiff, Juan Hernandez, brings this action against Defendants, 2400 Amsterdam Ave. Realty Corp., 2400 Amsterdam Avenue Realty Corp., Rick Elezi Management, Inc. d/b/a REM Residential, Atanasio Cortez,[1] Ricardo Cortez, and Alana Stridiron, seeking unpaid minimum and overtime wages pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the New York Labor Law ("NYLL") §§ 190 *et seq.* and 650 *et seq.*  *See* Am. Compl. ¶¶ 66–95, ECF No. 37.  Rick Elezi Management, Inc. ("REM") and Stridiron (together, the "REM Defendants") move for summary judgment on the ground that they are not Plaintiff's employers.  ECF No. 60; *see* Def. Mem., ECF No. 60-5.  For the reasons stated below, the REM Defendants' motion is GRANTED.

---

[1] The caption refers to Atanacio Cortez a/k/a Atanasio or Cortes.  Because the parties' briefing and exhibits indicate that his name is Atanasio Cortez, the Court shall use this spelling.

## BACKGROUND[2]

2400 Amsterdam Avenue Realty Corp. ("2400 Amsterdam Realty") owns three adjoining buildings at 501 West 179th Street, 2402 Amsterdam Avenue, and 2404 Amsterdam Avenue (the "Buildings"). A. Cortez Dep. at 5:24–6:21, 27:24–28:6, ECF No. 62-4; R. Cortez Dep. at 5:16–17, ECF No. 62-5; Am. Compl. ¶ 2. Atanasio Cortez is the president and owner of 2400 Amsterdam Realty, A. Cortez Dep. at 5:8–14, and his son, Ricardo Cortez, is the manager of the Buildings. R. Cortez Dep. at 4:23–5:2.

2400 Amsterdam Realty hired REM, a "property management company," to manage the Buildings. Pl. Opp. at 2, ECF No. 63; *see* Stridiron Aff. ¶ 2, ECF No. 60-3. Stridiron, a REM employee, is the property manager for the Buildings. Stridiron Dep. at 5:15–20, ECF No. 62-6. In that role, she is responsible for "collecting the rent [and] lease signings," Stridiron Aff. ¶ 3, "writ[ing] letters" if asked by the landlord, and "tak[ing] care of the paperwork that [the landlord] asks us to take care of," Stridiron Dep. at 6:2–5. Stridiron places the rent into an "operating account" for which 2400 Amsterdam Realty is the signatory, and is authorized to issue checks to 2400 Amsterdam Realty's employees. *Id.* at 7:19–8:21; *see* A. Cortez Dep. at 14:24–15:3 (REM "are the one who issue payments."). REM maintains records concerning the rent charged by 2400 Amsterdam Realty. *See* A. Cortez Dep. at 25:3–26:18 ("Alana Stridiron, that's my agent, my agent who does all of the . . . numbers and everything."); Stridiron Dep. at 11:15–22. But, REM does not keep files concerning 2400 Amsterdam Realty's employees. Stridiron Dep. at 11:23–12:5.

---

[2] The facts in this section are taken from the parties' Rule 56.1 statements, responses, and declarations, unless otherwise noted. Disputed facts are so noted. Citations to a paragraph in a Rule 56.1 statement also include the opposing party's response. "[W]here there are no citations[,] or where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (alteration omitted). On a motion for summary judgment, the facts must be read in the light most favorable to the non-moving party. *Id.* at 69.

From February 2019 to August 2021, Hernandez was a superintendent at the Buildings. A. Cortez Dep. at 7:22–8:2; Hernandez Dep. at 16:7–13, 19:23–25, ECF No. 62-7; *see* Am. Compl. ¶ 3. Hernandez testified that he was hired by Atanasio Cortez, who told Hernandez how much he would make per week. Hernandez Dep. at 18:11–20:8, 55:19–22; *see* A. Cortez Dep. at 8:6–24. Hernandez lived in an apartment in the Buildings while he worked there. Hernandez Dep. at 20:25–23:24; *see* A. Cortez Dep. at 24:1–18. As a superintendent, Hernandez responded at "all hours of the day" to the Buildings' tenants if there was "[a]nything that needed repairs or any complaints that [he] had to take care of." Hernandez Dep. at 31:7–22. He was also responsible for cleaning the Buildings and the sidewalks. *Id.* at 38:3–6, 41:3–11. Both Atanasio and Ricardo Cortez were on-site supervisors who assigned tasks to Hernandez. *Id.* at 52:7–53:25; R. Cortez Dep. at 7:18–9:8. In August 2021, Hernandez went to the Dominican Republic; on his return, he received a letter discharging him from his position. Hernandez Dep. at 16:14–17:12. Hernandez was not sure whether Atanasio or Ricardo made the decision to fire him. *Id.* at 52:3–6. Atanasio and Ricardo testified that it was Atanasio's decision. R. Cortez Dep. at 9:21–10:2; A. Cortez Dep. at 8:8–9.

The paychecks issued to Hernandez, as well as the termination letter, included similar language indicating that REM and Stridiron were sending them as agents of 2400 Amsterdam Realty:



*See* ECF Nos. 62-1, 62-2, 62-3. Atanasio testified that "the office and I . . . sen[t] him a letter" telling him that he was fired. A. Cortez Dep. at 15:4–13. Although Atanasio said that REM "pa[id] out whatever has to be paid," *id.* at 14:17–18, he and Ricardo both said that Atanasio set the pay rate. *See id.* at 8:13–20; R. Cortez Dep. at 7:8–14.

Hernandez testified that he saw Stridiron "a few times" at Atanasio and Ricardo's office and that the two "just greeted each other. That is it." Hernandez Dep. at 55:23–56:4; *accord* Stridiron Dep. at 17:7–14. Stridiron did not tell Hernandez how to do his job or keep track of his hours. Stridiron Dep. at 17:15–21, 18:9–20.

## LEGAL STANDARD

Summary judgment is appropriate where the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

The moving party initially bears the burden of demonstrating the absence of a genuine dispute of material fact by citing evidence in the record. *See Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro, Vt.*, 287 F.3d 162, 165 (2d Cir. 2002). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1); *Beard v. Banks*, 548 U.S. 521, 529 (2006); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam). In doing so, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), as "unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). "While Rule 56 does not obligate a court to perform an independent review of the record where a party does not adequately respond to a motion for summary judgment, nothing prevents the Court from exercising its discretion to conduct such a review." *Azor v. N.Y.C. Dep't of Corr.*, No. 10 Civ. 2235, 2012 WL 4809165, at *3 (S.D.N.Y. Oct. 9, 2012) (citation omitted). On a motion for summary judgment, courts view the record in the light most favorable to the non-moving party. *Koch*, 287 F.3d at 165.

4

## DISCUSSION

The FLSA imposes liability on any "employer" who violates its minimum wage, overtime, and recordkeeping provisions. *See* 29 U.S.C. § 216(b), (e)(2). The FLSA's definition of "employer" is written with "striking breadth," reflecting Congress' intent to break from the common-law definitions of employment.[3] *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008). "An individual may simultaneously have multiple employers for purposes of the FLSA, in which event, all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the FLSA." *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 421 (S.D.N.Y. 2017) (cleaned up).[4]

An employment relationship exists when the "economic reality" is such that the "alleged employer possessed the power to control the workers in question." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999); *accord Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961). Employment must be determined "on a case-by-case basis by review of the totality of the circumstances." *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013). Because the inquiry is necessarily "fact-intensive," awards of summary judgment, "although sometimes appropriate, are rare." *Gil v. Pizzarotti, LLC*, No. 19 Civ. 3497, 2021 WL 1178027, at *6 (S.D.N.Y. Mar. 29, 2021).

The Second Circuit has articulated two primary versions of the economic realities test: the formal-control test and the functional-control test. *See Greenawalt v. AT&T Mobility LLC*, 642 F. App'x 36, 37 (2d Cir. 2016) (summary order). These tests "state no rigid rule" but instead provide a set of factors to "ensure that the economic realities test mandated by the Supreme Court is sufficiently

---

[3] The statute defines "employer" as an entity "acting directly or indirectly in the interest of an employer in relation to an employee." *Id.* § 203(d). An "employee" is defined as "any individual employed by an employer." *Id.* § 203(e)(1). And to "employ" is "to suffer or permit to work." *Id.* § 203(g).

[4] "Courts have interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA." *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 335 n.13 (S.D.N.Y. 2010); *compare* 29 U.S.C. § 203(g) *with* N.Y. Lab. Law § 2(7). The Court's FLSA analysis shall, therefore, govern its NYLL analysis.

comprehensive and flexible to give proper effect to the broad language of the FLSA." *Barfield*, 537 F.3d at 143.

### I. Formal Control

The Court first considers whether a reasonable jury could find that the REM Defendants exercised "formal control" over Hernandez. *See Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984); *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 72 (2d Cir. 2003) (using the term "formal control" to describe the *Carter* test). The test examines whether the employer "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter*, 735 F.2d at 12.

First, as to the power to hire or fire, "direct involvement in the hiring process is necessary for the hiring factor to weigh in favor of formal control." *Gil*, 2021 WL 1178027, at *6. "Simply approving new hires" is insufficient. *Id.* And, to have the power to fire, the REM Defendants would need to be able to "terminate the workers' employment with" 2400 Amsterdam Realty altogether. *Id.* at *7 (collecting cases). Hernandez has not adduced any evidence that the REM Defendants had a say in his hiring or firing. First, it is undisputed that Atanasio made the decision to both hire and fire Hernandez. *See* Hernandez Dep. at 18:11–20:8, 55:19–22; A. Cortez Dep. at 8:6–24; R. Cortez Dep. at 9:21–10:2. Hernandez points to the termination letter, which includes REM and Stridiron's names in the signature block. But, the letter alone does not indicate the REM Defendants had the authority to fire Hernandez in light of Stridiron's testimony that Atanasio asked her to write the letter and routinely asked her to send letters on his behalf. *See* Stridiron Dep. at 6:2–5, 9:12–14; A. Cortez Dep. at 14:24–15:13. Therefore, this factor weighs against a finding of formal control.

Second, the REM Defendants did not supervise or control Hernandez's work schedules. Although "the law does not require an employer to look over his workers' shoulders every day to

exercise control," *Barfield*, 537 F.3d at 147 (citation omitted), there is no evidence that the REM Defendants exercised even "occasional[]" supervision and control. *Herman*, 172 F.3d at 139. Hernandez saw Stridiron only a "few times," and they did not speak beyond exchanging pleasantries. Hernandez Dep. at 55:23–56:4; *accord* Stridiron Dep. at 17:7–14. Hernandez testified that Atanasio and Ricardo were responsible for supervising him and providing him with work assignments. Hernandez Dep. at 52:7–53:25; R. Cortez Dep. at 7:18–9:8. And, Stridiron testified that she did not tell Hernandez how to do his job. Stridiron Dep. at 17:15–16. This factor also weighs against formal control.

Third, as to the rate and method of Hernandez's payment, "the test is whether a putative joint employer determines pay rates, not whether it affects them." *Jean-Louis v. Metro. Cable Commc'ns, Inc.*, 838 F. Supp. 2d 111, 129–30 (S.D.N.Y. 2021). Both Hernandez and Atanasio testified that Atanasio told Hernandez how much he was to be paid. Hernandez Dep. at 18:11–20:8, 55:19–22; A. Cortez Dep. at 8:6–24; R. Cortez Dep. at 7:8–14. And, Atanasio testified that he alone determined Hernandez's salary, without input from the REM Defendants. A. Cortez Dep. at 27:8–11. On the other hand, the REM Defendants were responsible for sending the checks to Hernandez, even if they only authorized such checks from 2400 Amsterdam Realty's operating account. Stridiron Dep. at 7:19–8:21. This indicates some control over the method of Hernandez's pay, if not the amount. Balanced against the REM Defendants' lack of control over Hernandez's payment, this factor is inconclusive. *See Fernandez v. HR Parking Inc.*, 407 F. Supp. 3d 445, 455 (S.D.N.Y. 2019) (finding that "some control" over the method of payment without specific control over the amount of payment was inconclusive).

Fourth, as to employment records, this factor would favor Hernandez if the REM Defendants "signed off on the time-card, verified the number of hours worked, and then provided records to the contractor" for payment. *Id.* at 456 (quoting *Barfield*, 537 F.3d at 136) (cleaned up). But, Stridiron

testified that, although she kept individual files for the tenants, she did not keep any records related to the employees, Stridiron Dep. at 11:23–12:5, and did not keep track of Hernandez's hours in issuing his checks, *id.* at 18:9–20. Hernandez has adduced no evidence that the REM Defendants possessed records which relate to "hours worked," the most relevant matter to minimum-wage and overtime obligations. *Vasto v. Credico (USA) LLC*, No. 15 Civ. 9298, 2017 WL 4877424, at *12 (S.D.N.Y. Oct. 27, 2017). This factor, therefore, also weighs against Hernandez.

None of the factors favor a finding that the REM Defendants exercised formal control, and at least three weigh against. A reasonable jury could not conclude, therefore, that the REM Defendants exercised formal control over Hernandez.

    II.    <u>Functional Control</u>

The formal-control test "defines employment more narrowly than [the] FLSA requires," so "satisfying this test is sufficient, but not necessary" to show employment. *Greenawalt*, 642 F. App'x at 37. Even if an entity does not satisfy the "formal control" test, it can still be deemed an "employer" under the FLSA if it had "functional control" over the workers—the second test outlined by the Second Circuit. *Zheng*, 355 F.3d at 72–76. The functional-control test requires courts to weigh six "nonexclusive and overlapping factors":

> (1) whether the alleged employers' premises and equipment were used for the plaintiff['s] work; (2) whether the subcontractors had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiff[] performed a discrete line job that was integral to the alleged employers' process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the alleged employers or their agents supervised plaintiff['s] work; and (6) whether plaintiff[] worked exclusively or predominantly for the alleged employers.

*Granda v. Trujillo*, No. 18 Civ. 3949, 2019 WL 367983, at *5 (S.D.N.Y. Jan. 30, 2019) (citing *Zheng*, 355 F.3d at 71–72) (cleaned up). The test seeks to pierce contracting arrangements that have "no substantial, independent economic purpose" and that are "most likely a subterfuge meant to evade the FLSA or other labor laws." *Zheng*, 355 F.3d at 72–73.

In his opposition to summary judgment, Hernandez does not address the REM Defendants' argument that they did not exercise functional control over him. *See* Pl. Opp. at 8–9. "A plaintiff effectively concedes a defendant's arguments by his failure to respond to them." *Felske v. Hirschmann*, No. 10 Civ. 8899, 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012).

Even if the Court were to consider the functional-control factors, the evidence contains no genuine issue of material fact.[5] The first, fourth, and fifth factors all inquire into Hernandez's relationship with the REM Defendants. But, the only indications of this relationship are the termination letter and checks with REM's name, and the few direct interactions between Hernandez and Stridiron. There is no evidence that Hernandez ever used the REM Defendants' premises or equipment, that Hernandez would have continued working with the REM Defendants if 2400 Amsterdam Realty had sold the Buildings, or that the REM Defendants supervised Hernandez's work. Therefore, the first, fourth, and fifth factors weigh against a finding of joint employment.

The second and third factors inquire into 2400 Amsterdam Realty's relationship with the REM Defendants. In certain cases, a property management service may be so integrated into the daily operations of an apartment building that the owners are unlikely to fire them or are dependent on them, and the service effectively controls the building. *See Falk v. Brennan*, 414 U.S. 190, 195 (1973) ("[T]he extent of [the management company's] managerial responsibilities at each of the buildings . . . gave it substantial control of the terms and conditions of the work of the . . . maintenance workers."); *Gordon v. Gen. Prop. Mgmt. Assocs., Inc.*, 496 F. Supp. 3d 830, 840 (S.D.N.Y. 2020). But, the record is devoid of facts that warrant the same conclusion here: there is no

---

[5] As an initial matter, the functional-control factors are "most relevant in the context of subcontractor relationships." *Granda*, 2019 WL 367983, at *5. The Second Circuit has used the test to assess whether, despite a formal arrangement to the contrary, a general contractor or franchisor was still an employer of a subcontractor's or franchisee's employees. *See, e.g.*, *Barfield*, 537 F.3d at 141; *Greenawalt*, 642 F. App'x at 37. Here, the question is whether the REM Defendants—who, akin to a subcontractor, provided "property management" services to 2400 Amsterdam Realty—employed Hernandez, not the other way around. Pl. Mem. at 2. Therefore, some of the factors are less directly applicable.

evidence that Hernandez's work as a superintendent was integral to the REM Defendants' work for 2400 Amsterdam Realty, which involved "tak[ing] care of the paperwork that [the landlord] asks [REM] to take care of" and collecting rent.  Stridiron Dep. at 6:2–5, 7:19–8:21.  And, there is no indication that 2400 Amsterdam Realty could not have hired a different property management service.

The sixth factor inquires into whether Hernandez worked exclusively for the REM Defendants.  Although there is no evidence that the REM Defendants assigned Hernandez tasks, 2400 Amsterdam Realty did not contract with any other property management services during Hernandez's employment.  A reasonable jury could find that this factor leans in Hernandez's favor.

When five of the functional-control factors weigh against a finding of joint employment and only one weighs slightly in favor, a reasonable jury could not find that the REM Defendants functionally controlled Hernandez's employment.

## CONCLUSION

For the foregoing reasons, the REM Defendants' motion for summary judgment is GRANTED.[6]  The Clerk of Court is directed to terminate the motion at ECF No. 60.

By separate order, the Court shall refer the matter for settlement.  By **June 1, 2024**, the parties shall file a joint status update as to settlement.  If the parties have not settled the matter, the Court shall set a trial date and related pre-trial deadlines on Plaintiff's claims.

SO ORDERED.

Dated: March 26, 2024
New York, New York

_____
ANALISA TORRES
United States District Judge

---

[6] The REM Defendants seek attorneys' fees for bringing the summary judgment motion because Plaintiff refused to dismiss his claims against them.  *See* Def. Mem. at 25.  That request, which the Court construes as a request for sanctions pursuant to Federal Rule of Civil Procedure 11, is DENIED.